224 F.3d 1014 (9th Cir. 2000)
 REBECCA ANN CAUDLE, a single woman, Plaintiff-Appellant/Cross-Appellee,
v.
BRISTOW OPTICAL COMPANY, INC., an Arizona corporation, Defendant-Appellee/Cross-Appellant.
 No. 98-15537, 98-15676
 
 REBECCA ANN CAUDLE, a single woman, Plaintiff-Appellant, v.
BRISTOW OPTICAL COMPANY, INC., an Arizona corporation; JANICE MILETICH, a single woman, Defendants-Appellees.
 Nos. 98-15760, 98-15676, 98-15760.
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted December 6, 1999--San Francisco, California
Filed September 14, 2000
Amended November 2, 2000
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: John Gabroy (argued), Richard A. Brown, Gabroy, Rollman & Bosse, P.C., Tucson, Arizona, for the plaintiff-appellant.
 David A. Selden (argued), John K. Ausdemore, Quarles & Brady, Phoenix, Arizona, for the defendant-appellee.
 Appeals from the United States District Court for the District of Arizona William D. Browning, District Judge, Presiding D.C. No. CV-95-00421-WDB
 Before: Diarmuid F. O'Scannlain, Susan P. Graber,* and William A. Fletcher, Circuit Judges.
 OPINION
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 In this pregnancy discrimination case, we must consider various issues raised under federal employment antidiscrimination law and state contract and tort law.
 
 
 2
 * Rebecca Ann Caudle sued her erstwhile employer, Bristow Optical Company, Inc. ("Bristow"), and her supervisor, Janice Miletich, after Bristow terminated Caudle's employment in the eighth month of her pregnancy. Caudle had joined Bristow as a salesperson on April 22, 1993; she was unmarried at the time. In August 1994, she realized that she was pregnant. On August 25, Caudle informed Miletich about her pregnancy and indicated that she intended to stay on the job.
 
 
 3
 Caudle and Miletich had experienced some tension before Caudle reported her pregnancy. According to Caudle, qualitycontrol problems in one of Bristow's laboratories had rendered her job extraordinarily difficult from the outset, and she discussed the difficulties with Miletich "very frequently." By November of 1994, the relationship between Caudle and Miletich had worsened. Miletich accused Caudle of lying about the situation underlying Bristow's quality-control problems. In December of 1994, citing Caudle's underperformance in increasing sales, Miletich suspended Caudle's base salary, thereby reducing Caudle's compensation to a commission. Miletich ultimately terminated Caudle's employment with Bristow on March 8, 1995, when Caudle was eight months pregnant.
 
 
 4
 After giving birth to her child in April 1995, Caudle began seeking substitute employment without success. In September of 1995, Caudle and her fiance "tentatively decided that it would be in the best interests of [their child ] for [Caudle] to stay at home with him for a certain period of time."
 
 
 5
 Meanwhile, Caudle had filed the complaint giving rise to this appeal in state court. In addition to claims not relevant here, Caudle asserted causes of action against Miletich for improper interference with contractual relations and against both Miletich and Bristow for pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. S 2000e(k), and wrongful termination under Arizona law. Bristow removed the case to federal district court, where the parties made cross-motions for summary judgment. Because it was undisputed that Caudle voluntarily left the workforce in September 1995, the court granted defendants' motion for summary judgment on Caudle's failure to mitigate damages after that date. Shortly before the trial on Caudle's surviving claims was to begin, the court winnowed the case further by granting Miletich's motion for a "directed verdict"[1] on Caudle's claim of tortious interference with contractual relations. Caudle's remaining claims of pregnancy discrimination under federal law and wrongful termination under Arizona law went to a jury, which returned verdicts for Caudle in the amount of $15,000 compensatory damages on her state law claim and in the amounts of $10,000 back pay and $55,000 punitive damages on her federal claim.
 
 
 6
 Bristow and Miletich moved the court for a new trial or judgment as a matter of law and to set aside the jury's punitive damages award. The court denied the defendants' motions but did limit punitive damages to $50,000 in order to bring them under the cap on total damages for employers with fewer than 101 employees pursuant to 42 U.S.C. S 1981a(b) (3)(A). In doing so, the court denied Caudle's motion to treat Bristow and Heard Optical Co. ("Heard"), Bristow's corporate affiliate, as a "single employer" for the purpose of raising the applicable cap on damages. The court also held that the $10,000 award under Title VII and the $15,000 award on the state wrongful termination claim were redundant and, therefore, reduced the award on the state claim to $5,000, the amount by which it exceeded the jury's back pay award on the federal claim.
 
 
 7
 At the conclusion of the proceedings on the merits, Caudle, Bristow, and Miletich filed for attorneys' fees. The court concluded that Caudle was the prevailing party and that all of her claims were related and awarded her $20,000 of the approximately $76,000 that she requested. The court denied Bristow's and Miletich's motions for attorneys' fees.
 
 
 8
 Caudle and Bristow timely filed their respective appeal and cross-appeal.
 
 II
 
 9
 We first consider Caudle's appeal of those claims upon which she did not prevail. The district court's judgment for Caudle on her Title VII claim included a $10,000 award of back pay for the period extending from March 1995, when her employment at Bristow was terminated, to September 1995, when she elected to stay at home with her child for a period that she originally anticipated would last approximately three years. The district court did not, however, permit Caudle to offer evidence to the jury on damages that she allegedly incurred after September 1995, because her voluntary withdrawal from the workforce at that time undisputedly dispelled any reasonable expectation of continuing employment with Bristow (and would have done so even if she had never been terminated) and also constituted a failure to mitigate damages. Caudle appeals the court's ruling on this score. She argues that she should have been permitted to prove and to recover the amount by which the income that she would have received as a Bristow employee exceeded her actual income for the period after she re-entered the workforce in 1997.
 
 
 10
 * Title VII of the Civil Rights Act of 1964 permits courts to grant equitable remedies to employees who have been impermissibly discriminated against by employers with fifteen or more employees. See 42 U.S.C. S 2000e-5(g) (1994). The relevant remedies include reinstatement and awards of back pay and front pay. An award of back pay is appropriate to advance "Congress' intent to make `persons whole for injuries suffered through past discrimination.' " Loeffler v. Frank, 486 U.S. 549, 558 (1988) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975)). Indeed, there is a presumption in favor of back pay awards. See Albemarle Paper, 422 U.S. at 421. "Front pay is the term used to describe damages paid as [prospective] compensation for training or relocating to another position. An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." Fadhl v. City and County of San Francisco, 741 F.2d 1163, 1167 (9th Cir. 1984), overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); see also Thorne v. City of El Segundo, 802 F.2d 1131, 1137 (9th Cir. 1986). In relation to front pay, "reinstatement, when it is feasible, is the `preferred remedy' in a discrimination suit." Gotthardt v. National R.R. Passenger Corp., 191 F.3d 1148, 1156 (9th Cir. 1999).
 
 
 11
 Section 2000e-5 imposes upon plaintiffs seeking back pay a duty to mitigate damages by seeking alternative employment with "reasonable diligence." See 42 U.S.C. S 2000e-5(g)(1) (1994). The same requirement has been used to constrain awards of front pay. See Gotthardt , 191 F.3d at 1157 ("A court awarding front pay should consider a plaintiff's ability to mitigate her damages by finding other employment in the future . . . . `Because of the potential for windfall, [front pay's] use must be tempered.' " (quoting Duke v. Uniroyal, Inc., 928 F.2d 1413, 1424 (4th Cir. 1991)).
 
 B
 
 12
 The district court ruled that Caudle's withdrawal from the workforce in September 1995 barred her recovery under Title VII as of that date because the withdrawal was voluntary. The court apparently found Caudle's decision to withdraw from the workforce not only uncompelled by her situation but also unaffected by the defendant's discriminatory behavior. In holding that the voluntariness of Caudle's withdrawal precluded her recovery for lost pay during the ensuing period, the district court correctly focused on the general objective underlying Title VII remedies and the plaintiff's duty to mitigate damages generally: ensuring that the plaintiff is made whole. See Albemarle Paper, 422 U.S. at 421.
 
 
 13
 Caudle never alleged (and there is no reason otherwise to believe) that her decision to withdraw from the workforce in September 1995 was in any way affected by Bristow's discriminatory termination of her employment.[2] She therefore failed to show that her diminished income after that date was not "voluntary" and was thus an injury for which she would need to be "made whole" by Bristow. Absent any injury, an award of back pay or front pay is plainly unwarranted under 42 U.S.C. S 2000e-5(g)(1). See Ford Motor Co. v. EEOC, 458 U.S. 219, 230 (1982) (noting that the purpose of equitable relief under Title VII is " `to make the victims of unlawful discrimination whole' by restoring them, `so far as possible . . . to a position where they would have been were it not for the unlawful discrimination.' " (quoting Albemarle Paper, 422 U.S. at 421)); cf. id. at 237 (precluding Title VII plaintiffs' eligibility for back pay for the period after they had rejected an offer of the employment that they had previously been denied, on the ground that allowing eligibility in such circumstances would ensure that the plaintiffs were more than "made whole").
 
 
 14
 Neither did Caudle suffer a cognizable injury after returning to the workforce in 1997. Caudle had rejected an offer of reinstatement from Bristow but failed to demonstrate that there existed "excessive hostility between the parties." Thorne v. City of El Segundo, 802 F.2d 1131, 1137 (9th Cir. 1985). The offer would have placed Caudle under a different supervisor and in a different job; she would have had only incidental contact with Miletich. Caudle testified only that she would "feel very awkward" to have such incidental contact and therefore would not return to Bristow. Such testimony was insufficient to permit a fact-finder to conclude that excessive hostility existed between Caudle and Bristow.
 
 
 15
 The district court did not err in implicitly finding that Caudle suffered no injury after September 1995. Hence, the court did not abuse its discretion in granting summary judgment to Bristow on its liability for back and front pay for the same period.[3]
 
 III
 
 16
 In addition to challenging the district court's total denial of recovery for the period after she withdrew from the workforce, Caudle contends that the district court erred in reducing the damages that the jury awarded her on the federal and state claims that arose before she withdrew from the workforce.
 
 
 17
 * First, Caudle challenges the district court's order denying her motion to have Bristow and its non-party corporate relative, Heard, declared a "single employer" for purposes of applying the liability cap imposed by 42 U.S.C.S 1981a(b)(3) (1994). That provision limits combined punitive and compensatory damages at $50,000 for defendants with fewer than 101 employees and at $100,000 for defendants with more than 100 but fewer than 201 employees. Compare id.S 1981a(b)(3)(A) with id. S 1981a(b)(3)(B). Because the jury had awarded her $55,000 in punitive damages despite the fact that Bristow employed fewer than 101 people and thus was liable for up to only $50,000, Caudle moved after the trial to have Bristow and Heard declared a "single employer" for purposes of raising the number of employees to more than 101 and thereby raising the cap to $100,000. The district court denied Caudle's motion and reduced the jury's award of punitive damages to Caudle by $5000, to a total of $50,000, the maximum available under S 1981a(b)(3)(A).
 
 
 18
 The district court's denial of Caudle's motion was based on two grounds relating to its improvident timing. First, the court found that the record was insufficient to support an informed judgment on the issue of Heard's relationship to Bristow. As the court stated in its order, "it is conceivable and probable that evidence bearing directly on this single issue would have been more clearly presented to the Court if Heard knew its exposure was dependent on its provable relationship to Bristow." Second, the court concluded that Caudle's waiting until after the trial was over to bring her motion manifested purely gratuitous delay.
 
 
 19
 We review the district court's denial of a motion as untimely for an abuse of discretion. Cf. Tell v. Trustees of Dartmouth College, 145 F.3d 417, 419-20 (1st Cir. 1998) ("The district court said that the argument had been waived because it came too late . . . . We review the refusal of the district court to reconsider under an abuse of discretion standard.").
 
 
 20
 The court's determination that the record as developed at trial would provide an inadequate basis for reaching a balanced judgment does not amount to an abuse of discretion. The pre-existing evidence on which Caudle relies in arguing that the standard for finding a "single employer " had already been met does not refute the premise of the court's dismissal. Bristow or Heard might have introduced countervailing evidence had they known that their combined potential liability could otherwise be $50,000 greater than was Bristow's alone.[4]
 
 
 21
 As to the court's conclusion that Caudle's motion came inexcusably late in the day, Caudle appears to argue that the timing of her motion was justified by Bristow's own effort "to blur--more accurately, to obliterate--the distinction between Bristow and Heard." Caudle states that she moved to have Heard and Bristow deemed a single employer "only after the district court permitted Defendants" to introduce the evidence supporting her contention. The district court's conclusion that Caudle's motion was untimely was based on the fact, however, that Caudle's motion came too long after she knew that Bristow would be relying on evidence of Heard's personnel policies. The district court admitted the evidence on December 2, 1997, and Caudle waited until more than one month later (until after the trial was concluded and judgment was rendered) before she moved to have Bristow and Heard deemed a single employer. As the court noted in denying the order, there is no discernible reason for Caudle's delay. On these facts, the court did not abuse its discretion in denying Caudle's motion, and her punitive damages award was correctly reduced from $55,000 to $50,000 to conform with 42 U.S.C. S 1981a(b)(3)(A).[5]
 
 B
 
 22
 Caudle also challenges the district court's reduction of the jury's award on her state law wrongful discharge claim from $15,000 to $5,000. The district court reduced the state law award after concluding that it was "duplicative " of a $10,000 award on Caudle's Title VII claim. The district court characterized the $10,000 Title VII award, which the jury returned in addition to the $55,000 award of punitive damages, as an award of back pay and thus not subject to the fee cap under 42 U.S.C. S 1981a(b)(3)(A).
 
 
 23
 We will not disturb a district court's Title VII remedy unless the district court abused its discretion in fashioning that remedy. See Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1495 (9th Cir. 1995) ("The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole. We review a district court's award of damages under an abuse of discretion standard." (citations omitted)). Hence, we review for abuse of discretion a district court's allocation of a jury's general damages award amongst the plaintiff's various causes of action. See Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 509 (9th Cir. 2000) (noting that a district court's allocation of a jury verdict is reviewed for an abuse of discretion unless "the allocation decision rests on an interpretation of the [underlying] statute").
 
 
 24
 Caudle argues that the district court's adjustment of the jury's state law verdict was "clearly erroneous " because there was no basis for determining that the state law award was premised on the same damages as the back pay award.[6] This argument is groundless. It is beyond dispute that the $10,000 back pay award represented Caudle's lost earnings during the period from her discharge to September 1995. It is similarly beyond dispute that the district court instructed the jury that, if it found that Bristow had terminated Caudle in violation of Arizona public policy, it was to award Caudle "the full amount of money that w[ould] . . . compensate[Caudle] for each of the . . . elements of [her] damages," including her "[l]ost earnings to September 30, 1995" (emphasis added). "[T]he law presumes that jurors carefully follow the instructions given to them," Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994), and there is nothing to suggest that they failed to do so here. The district court did not abuse its discretion in striking $10,000 from the award of damages for Caudle's state law claim.
 
 IV
 
 25
 Caudle also appeals from the district court's directed verdict for Miletich on her claim of "improper interference with contractual relations." The claim was based on Caudle's allegation that Miletich terminated her employment with Bristow because she was pregnant.
 
 
 26
 * In Wagenseller v. Scottsdale Memorial Hospital , 710 P.2d 1025 (Ariz. 1985), superseded in other respects by Ariz. Rev. Stat. S 23-1501 (1996), the Supreme Court of Arizona addressed the elements of the tort of intentional interference with contractual relations as those elements apply to the conduct of a supervisor who is alleged to have interfered with the contract between a supervisee and her employer. Prior to the Wagenseller decision, there were four acknowledged elements of the tort of intentional interference in Arizona: (1) the existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferer, (3) intentional interference inducing a breach or termination of the contract, and (4) resultant damage to the complaining party to the contract. See id. at 1041. In Wagenseller , the court explicitly rejected a lower court's conclusion that a supervisor who terminated an employee generally would be privileged against the claim of intentional interference with an employment contract, see id. at 1042, and instead addressed the liability of supervisors by adding a fifth element to the tort of intentional interference: whether the supervisor's (or any defendant's) interference was "improper," see id. 1042-43 ("In addition to proving the four elements stated in Antwerp,. . . the plaintiff must show that the defendant acted improperly.").[7]
 
 
 27
 Here, the district court concluded in part that Miletich's actions did not satisfy the Wagenseller criteria because her actions did not amount to "interference" with the contract between Caudle and Bristow:
 
 
 28
 Are you seriously contending that interference with a contractual relationship is a viable tort? I can't conceive with the evidence that's now before me how that is the case, where the other two executives in Heard and Bristow were urging [Caudle] to be discharged before Ms. Miletich actually discharged her . . . . [H]ow could Ms. Miletich be the interfering person?
 
 
 29
 Shortly after this observation, the court entered a directed verdict for Miletich.
 
 
 30
 On appeal, Caudle suggests that there was substantial evidence that Miletich personally interfered with her contract with Bristow. Caudle points to evidence that Miletich (1) "ignored" her complaints that the quality of the products from Bristow's Tucson lab had deteriorated, (2) improperly withdrew her base salary in December 1994, and (3) "shunned" her.
 
 B
 
 31
 A directed verdict should be granted "only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant. " Shoen v. Shoen, 952 P.2d 302, 303 (Ariz. Ct. App. 1998); see also Amarel v. Connell, 102 F.3d 1494, 1517 (9th Cir. 1997) (as amended) ("A directed verdict is proper when the evidence permits only one reasonable conclusion.").
 
 
 32
 We are not persuaded that the evidence to which Caudle directs our attention establishes that Miletich was a significant cause of her termination. Cf. Wagenseller, 710 P.2d at 1041. Even if wholly accurate, Caudle's allegation that Miletich did not actively assist in her problems with the Tucson lab does nothing to establish that Miletich "interfered " in the contractual relationship between Caudle and Bristow. We are aware of no authority for the counter-intuitive proposition that nonfeasance can amount to interference and, in any event, there is no evidence that Miletich defaulted on a duty that was actually hers to discharge. Similarly, Miletich's withdrawal of Caudle's base salary in December of 1994 cannot credibly be characterized as inducing Caudle's termination, because Caudle's working on a commission-only basis could only have reduced the cost to Bristow of Caudle's problematic sales and thereby eased the financial difficulties associated therewith. Indeed, the fact that Miletich took the intermediate step of withdrawing Caudle's base salary rather than terminating Caudle at that very point strongly suggests that Miletich was not predisposed to have Caudle's employment terminated at all. Finally, the allegation that Miletich "shunned" Caudle has no "probative value" whatsoever, Shoen, 952 P.2d at 303, visa-vis the claim that Miletich induced Bristow's termination of Caudle's employment.
 
 
 33
 Given that none of Caudle's allegations about Miletich's behavior tend to establish that Miletich herself caused or induced the termination of her employment at Bristow (and that at least one of those allegations tends to establish instead that Miletich hoped to extend Caudle's employment as long as practicable), we must agree with the district court. The undisputed averments showing that Miletich's superiors had resolved to terminate Caudle's employment before she took any steps in that direction establish that no reasonable person could conclude on the evidence presented that Miletich herself "interfered" with Caudle's employment contract with Bristow.[8]
 
 V
 
 34
 On cross-appeal, Bristow seeks review of the district court's order denying Bristow's motion for judgment as a matter of law or, in the alternative, a new trial on Caudle's discrimination claims.
 
 
 35
 Bristow urges the reversal of the verdict against it because the district court did not allow Bristow to introduce all of the evidence that it sought to introduce on how pregnant employees were treated in general and because Caudle's evidence failed to support two elements of a prima facie case of discrimination: that Caudle was satisfactorily performing her duties and that she was discharged under circumstances giving rise to an inference of discrimination.
 
 
 36
 The district court excluded any evidence of how Bristow or Heard treated pregnant employees who, unlike Caudle, were married at the time of their pregnancy. Bristow based its motion for judgment as a matter of law or, in the alternative, retrial on this evidentiary ruling of the district court. To the extent that Bristow contends that the adverse judgment of the district court should be set aside because of the district court's evidentiary ruling, Bristow is effectively appealing the district court's evidentiary ruling directly. In order to succeed with such an appeal, Bristow must contend not only that the district court's ruling was an abuse of discretion but that the ruling was prejudicial.
 
 
 37
 We need not reach the issue whether the district court's evidentiary ruling prejudiced Bristow's defense, because the district court did not abuse its discretion in excluding the evidence of Bristow and Heard's treatment of pregnant but married employees. The district court implicitly concluded that evidence of how Bristow and Heard treated pregnant but married employees would not be sufficiently probative of the facts alleged in this case to outweigh its potentially prejudicial tendencies. The district court's implicit conclusion simply does not appear to fall outside "a broad range of permissible conclusions," Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400 (1990), for there was evidence that Caudle's pregnancy led to her discharge exactly because she was also a single woman. In light of this evidence, the fact that Bristow and Heard did not tend to discriminate against pregnant women who were married was not plainly probative of the truth of Caudle's allegation. Cf. Harris v. Davis, 874 F.2d 461, 464 (7th Cir. 1989) (observing that the standard for admission of evidence of other acts by the defendant requires that "the other act must be similar enough . . . to be relevant to the matter in issue"). Bristow cites a number of cases wherein courts have acknowledged that the defendant's treatment of pregnant women generally is useful in evaluating a claim that the defendant intentionally discriminated against the plaintiff on the basis of her pregnancy. Bristow fails to cite, however, any authority suggesting that the district court in this case lacked the discretion to exclude evidence of how Bristow treated pregnant employees who were unlike Caudle. We conclude that the district court did have that discretion and did not abuse it on these facts.
 
 
 38
 Bristow also argues that the district court erred in denying its motion for retrial or judgment as a matter of law because Caudle failed to prove an element of the prima facie case of discrimination: that she was performing her job satisfactorily. Bristow simply does not, however, meet its burden of showing either that the district court abused its discretion or that the facts as construed in favor of Caudle lead inevitably to the conclusion that Caudle failed to perform her job satisfactorily. We therefore affirm the district court's denial of Bristow's motion for retrial or judgment as a matter of law insofar as the motion was predicated on Caudle's alleged failure to show that she was performing her job satisfactorily.
 
 
 39
 Finally, Bristow's argument that Caudle's case did not support an inference of discrimination is limited to two facts. The first is that allegations of discriminatory intent were limited to Miletich despite the fact that Miletich was the last to determine that Caudle had to be discharged, and the second is that another employee stated that "Miletich was very sympathetic and supportive of [that employee] during the time she was single and pregnant." In light of the evidence that Caudle introduced (including testimony as to Miletich's statements about Caudle) that directly evinced at least some degree of discriminatory intent on the part of Miletich, it is plain that Bristow's bases for dissatisfaction would not lead a reasonable person inexorably to the conclusion that the jury and the district court erred in finding that Miletich ultimately fired Caudle because was pregnant. We also affirm, therefore, the district court's denial of Bristow's motion for a new trial or judgment as a matter of law insofar as the motion was predicated on Caudle's alleged failure to show that she was discharged in circumstances giving rise to an inference of unlawful discrimination.
 
 VI
 
 40
 Bristow also challenges the district court's decision to maintain the jury's award of punitive damages to Caudle under 42 U.S.C. S 1981a. Bristow argues that this court's subsequent decision in Ngo v. Reno Hilton Resort Corp., 140 F.3d 1299, 1304 (9th Cir. 1998), changed the standard under which the district court should have reviewed Caudle's entitlement to punitive damages and thus that the district court's decision should be remanded for reconsideration.
 
 
 41
 We agree with Bristow that Ngo represents the first time that we have held that a Title VII plaintiff's entitlement to punitive damages under S 1981a is not established by the plaintiff's proof that she suffered unlawful discrimination. We do not agree, however, with Bristow's contention that the district court did not apply the heightened standard adopted in Ngo to the claim for punitive damages in this case.
 
 
 42
 In Ngo, we interpreted S 1981a "to require plaintiffs seeking punitive damages to make a showing beyond the threshold level of intent required for compensatory liability. " 140 F.3d at 1304. Such plaintiffs must now show that "the acts of discrimination giving rise to liability are willful and egregious, or display reckless indifference to the plaintiff's federal rights." Id. (footnotes omitted). This standard for punitive damages under S 1981a was, at the time we adopted it in Ngo, maintained by at least four other circuits. See id. Hence, the fact that the district court in the instant case concluded that punitive damages were available before our decision in Ngo was handed down does not imply that the district court applied a lesser standard than the one adopted in Ngo. On the contrary, the U.S. District Court for the District of Arizona already had adopted the heightened standard we eventually adopted in Ngo before that court awarded punitive damages in this case. See Taylor v. ScottPolar Corp., 995 F. Supp. 1072, 1080-81 (D. Ariz. 1998). In Taylor, the district court (as we did in Ngo) looked to appellate decisions outside of the Ninth Circuit and concluded that "the better reasoned cases are those that require a higher level of offensive conduct to award punitive damages" under S 1981a. Id. at 1081. The district court thus held in that case that punitive damages were not warranted because the evidence did not establish that the defendant was guilty of "especially egregious or offensive conduct." Id. The district court's earlier decision in Taylor establishes that it imposed, as Ngo requires, a heightened standard on claims for punitive damages under S 1981a at the very time that it concluded that such damages were legally available in the instant case.[9] Bristow's claim that this court's decision in Ngo requires the panel to remand the district court's award of punitive damages is, therefore, unsustainable.
 
 
 43
 We agree with the district court's conclusion that the jury could have appropriately awarded punitive damages in this case. The jury's verdict for Caudle on her Title VII claim may well have rested on the conclusion that Bristow and its officers were "recklessly indifferent" to Caudle's federal rights in viewing her unwed pregnancy with contempt and failing to respond to the corporate problems that Caudle reported and suffered from.
 
 VII
 
 44
 Bristow further contends that the district court erred in failing to set aside or reduce the jury's award of punitive damages by more than the cap under S 1981a required.
 
 
 45
 * Bristow argues first that the district court mistakenly concluded that it did not have any discretion to reduce the jury's punitive damages award by more than was necessary to comply with the damages cap imposed by S 1981a(b)(3). Bristow bases this argument on the district court's statement that "[n]o further reduction is allowed."
 
 
 46
 "A district court's failure to exercise discretion constitutes an abuse of discretion." Miller v. Hambrick , 905 F.2d 259, 262 (9th Cir. 1990). Hence, if the district court in fact concluded that it was barred by law from reducing the jury's award of punitive damages by more than $5,000, the district court abused its discretion and the punitive damages award must be remanded.
 
 
 47
 It does not appear to us, however, that the district court reached any such conclusion. The context of the district court's statement reveals that the district court was rendering all of its decisions in the passive voice: "Defendant's Motion to Reduce Punitive Damages to $50,000 in accordance with the statutory cap is GRANTED. No further reduction is allowed however and the Motion to Set Aside the Punitive Damages Award is DENIED." It is true that this compositional infelicity obfuscates the issue of whether the district court declined to allow further reductions or considered itself precluded from doing so. We will not, however, infer from ambiguous language that a district court has declined to exercise its discretion. See, e.g., United States v. Garcia-Garcia, 927 F.2d 489, 491 (9th Cir. 1991) (holding that a court's silence regarding its discretion is not sufficient to indicate that the court in fact believed that it had none). We must therefore reject Bristow's contention that the district court abused its discretion by failing to exercise it here.
 
 B
 
 48
 Bristow argues in the alternative that the district court erred in declining to reduce or set aside the jury's punitive damages award in light of the fact that Bristow's behavior did not constitute one of the "most egregious cases" of discrimination in violation of Title VII.
 
 
 49
 A jury's award of punitive damages is not to be lightly disturbed. See Kennedy v. Los Angeles Police Dep't , 901 F.2d 702, 707 n.3 (9th Cir. 1990). Reflecting our general deference to jury verdicts, we have never required the district court to adjust a jury's punitive damages verdict so that it is proportional, in the court's view, to the defendant's wickedness. Such proportional adjustments are left to the jury itself. See id.[10] We thus reject Bristow's contention that the district court abused its discretion in accepting the jury's punitive damages award.
 
 VIII
 
 50
 Finally, Caudle appeals the district court's partial denial of attorneys' fees. Caudle moved for an award of attorneys' fees in the amount of $76,157.50, but the district court, after concluding that she was the prevailing party in the litigation and that all of her claims were related for purposes of calculating an award, awarded her only $20,000.
 
 
 51
 This circuit requires a district court to calculate an award of attorneys' fees by first calculating the "lodestar." See, e.g., Morales v. City of San Rafael, 96 F.3d 359, 363 (9th Cir. 1996) (reversing the district court's award of attorneys' fees because the district court failed to calculate a lodestar figure and assess the extent to which the recognized bases for adjusting that figure applied). "The `lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate," id., and it presumably incorporates consideration of the results obtained by the prevailing litigant, as required by Hensley v. Eckerhart, 461 U.S. 424 (1983), as well as a number of other relevant considerations, see Morales, 96 F.3d at 363 n.8. After computing the lodestar, the district court should assess whether additional considerations that this court has enumerated, see Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th Cir. 1975), require the district court to adjust the figure, see Morales, 96 F.3d at 363-64.
 
 
 52
 In the instant case, the district court did not explicitly follow these procedures and thus did not make it clear whether its award of attorneys' fees to Caudle in the amount of $20,000 reflected an unadjusted lodestar figure, a lodestar that the district court had adjusted by applying factors that were neither subsumed in the computation of the lodestar figure itself nor specifically impermissible, or an improperly generalized approximation of the appropriate award. The court simply stated the total award, listing a few of the considerations that purportedly played a role in the calculation of that figure:
 
 
 53
 The Court finds that a reasonable attorney's fee for Plaintiff is $20,000, given the amount of recovery and failure to prevail on all issues and against all parties.
 
 
 54
 . . . . The Court has weighed the matters set forth by the parties and is of the opinion that this result is fair and reasonable to both parties.
 
 
 55
 This was the entirety of the district court's analysis relating to its award of attorneys' fees to Caudle. The court did not, for instance, indicate whether it was reducing the hourly rate or number of hours for which Caudle offered billing invoices, cf. Hensley, 461 U.S. at 433-34 (noting that the district court in making an initial estimate of attorneys' fees "should exclude . . . hours that were not `reasonably expended' " or sufficiently documented), or whether the total that Caudle sought required overall adjustment, cf. Blum v. Stenson , 465 U.S. 886, 898 (1984) (recounting the district court's reasons, including the high quality of the representation, for enhancing an award of attorneys' fees). The extent of the court's reliance on such factors is not apparent because the district court failed to discharge its obligation to "provide a concise but clear explanation of its reasons for the fee award" in this case. Hensley, 461 U.S. at 437.[11]
 
 
 56
 Calculating the lodestar requires the district court to find the product of the number of hours the attorneys reasonably expended and the rate the attorneys reasonably charged, with reasonableness informed by various considerations, including the plaintiff's success. See, e.g., Morales, 96 F.3d at 363. The precision with which the district court relays this calculation is somewhat discretionary, but we do require the district court to " `articulate with sufficient clarity' " the manner in which it adjusts the lodestar figure. Quesada, 850 F.2d at 539. Here, the district court failed to do so, preventing our effective review of its exercise of discretion. We therefore reverse the award and remand it with directions to the district court to make the requisite findings and to revise the award if necessary.
 
 
 57
 AFFIRMED as to the merits and REVERSED as to attorneys' fees, and REMANDED for proceedings not inconsistent with this opinion. Caudle's costs and attorneys' fees for services rendered in connection with this appeal shall be fixed by the district court on remand.
 
 
 
 Notes:
 
 
 *
 Judge Graber was drawn to replace Judge Wiggins, who died subsequent to oral argument. She has read the briefs, reviewed the record, and listened to the tape of oral argument held on December 6, 1999.
 
 
 [1]
 Miletich's motion is probably better construed as a motion for summary judgment, for both the motion and the court's action thereon preceded the trial.
 
 
 [2]
 Caudle maintains in her brief that the record reflects her intent, when her employment at Bristow was terminated, to return to the workforce "following a brief, two-week maternity leave" and that Caudle would in fact have returned "but for Defendants' discriminatory actions" (emphasis added). Caudle's contention, however, is neither disputed nor relevant to the district court's decision, for Caudle was not considered to have withdrawn from the workforce until September 1995 (six months after her proposed two-week maternity leave). It was not until that point, according to the district court's order, that her eligibility for back pay was precluded.
 
 
 [3]
 Caudle argues in the alternative that Bristow failed to meet its burden of demonstrating that she had failed to mitigate her damages because it had not established that there were comparable jobs available that she had failed to pursue. Bristow relied on the submission of classified employment advertisements with large numbers of postings for positions facially comparable to Caudle's. Other circuits have upheld determinations that comparable work was available on similar evidence. See, e.g., Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995). The district court did not err in relying on such evidence here.
 
 
 [4]
 We agree with Caudle that the district court erred insofar as it suggested that Heard had to be a named party-defendant in the suit before it could be found to form a "single employer" with Bristow. Such a finding would result in no legal judgment against Heard itself, and, if Heard's relationship with Bristow were in fact so close that it satisfied the criteria for a "single employer," it would be difficult to maintain credibly that Heard lacked sufficient notice of its increased exposure through Bristow's heightened liability under S 1981a. We are confident, however, that the district court observed that Heard was not a party to the litigation merely to articulate the context of the court's concern about the sufficiency of the record, a consideration that independently justifies the court's denial of Caudle's motion.
 Because "we can affirm the district court on any grounds supported by the record," Weiser v. United States, 959 F.2d 146, 147 (9th Cir.1992), whether the court in fact erred on the importance of Heard's being a partydefendant is not dispositive.
 
 
 [5]
 We acknowledge that, in Greenway v. Buffalo Hilton Hotel, 951 F. Supp. 1039 (W.D.N.Y. 1997), a plaintiff who sought to evade the $200,000 cap on damages for employers with fewer than 501 employees under 42 U.S.C. S 1981a(b)(3)(D) successfully moved after trial to have the defendant and several non-party hotels owned by the same person to be declared a single employer. Even if Greenway were controlling authority, it would be impossible for us to discern whether the Greenway court had grounds for greater confidence in the development of the record than the district court had in this case. In any event, the abuse-of-discretion standard is a deferential one, and the deference that is required prevents us from reversing the district court's determination on such a matter. See United States v. Schlette, 842 F.2d 1574, 1577 (9th Cir. 1988) ("Under this deferential standard of review, this court does not substitute its judgment for that of the district court.").
 
 
 [6]
 Caudle also maintains that, because back pay is an equitable remedy, the back pay award was not premised on "damages " at all and thus, by definition, did not overlap with the compensatory damages award under state law. This argument, not vigorously pressed, gives too much significance to a mere label: "Equity" is the character of the remedy, not of the wrong that the district court found here to be twice redressed (once equitably and once through the award of damages). Cf. Provencher v. CVS Pharmacy, 145 F.3d 5, 12 (1st Cir. 1998) (noting that "back pay awards serve a similar purpose as compensatory damages awards").
 
 
 [7]
 Although not relevant to our analysis here, we note that the Wagenseller court enumerated seven factors by which to evaluate the propriety of the alleged interferer's motive. The factors are: (1) the nature of the actor's conduct, (2) the motive, (3) the interests of the parties to the contract, (4) the interests sought to be advanced by the actor, (5) the relative social interests in protecting the freedoms of the actor and the parties to the contract, (6) the proximity of the actor's conduct to the interference, and (7) the relations between the parties. See id. at 1042.
 
 
 [8]
 To the extent that Caudle's wrongful interference claim rests upon Bristow's withdrawal of Caudle's salary (and thus paying her only on commission), the district court could not have erred in granting a directed verdict, for there was no evidence that Caudle was guaranteed a prospective level of pay as a term of her employment contract.
 
 
 [9]
 Bristow also attacks the sufficiency of the evidence supporting an award of punitive damages in this case by noting that the district court found that the evidence would not support an award of punitive damages under Arizona law. More specifically, Bristow contends that the district court's determination that the evidence in this case did not satisfy the criteria for punitive damages under Arizona law compels the conclusion that punitive damages were unavailable under S 1981a (as interpreted by Ngo). We reject this contention. As the district court in Taylor recognized, the standard for punitive damages under Arizona law is stricter than the standard under Title VII, in that Arizona law requires a plaintiff to demonstrate that the defendant evinced an "evil mind. " See Taylor, 995 F. Supp. at 1081 n.5. There is no requirement of an "evil mind" under S 1981a-even as that section was interpreted by this court in Ngo. See Ngo, 140 F.3d at 1304-05 (requiring only "reckless indifference" or "conscious and deliberate disregard for [the plaintiff's] federally-protected right").
 
 
 [10]
 Bristow acknowledges that there is no authority in this circuit for the proposition that a punitive damages award must be tailored so as to be proportional to the defendant's culpability (or, in other words, that the maximum award must be reserved for the worst offenders). Bristow relies instead on a case from the Seventh Circuit, Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344 (7th Cir. 1995). To the extent that Hennessy stands for the proposition that Bristow urges, however, that case has not been followed by any other circuit, and we decline to follow it here.
 
 
 [11]
 It is also unclear whether the district court reduced its award of attorneys' fees to Caudle because "the amount of recovery" she realized was itself modest, which would have been an abuse of discretion, see Quesada v. Thomason, 850 F.2d 537, 540 (9th Cir. 1988) ("[I]t is inappropriate for a district court to reduce a fee award below the lodestar simply because the damages are small."), or because "the amount of recovery" was modest relative to the amount Caudle initially sought, which would have been a generally permissible reference to "the degree of success [she] obtained," Hensley, 461 U.S. at 436 ("If, on the other hand, a plaintiff has achieved only partial or limited success, the [lodestar figure] may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.").