NOONAN, Circuit Judge.
James M. Irvin, a citizen of Arizona, appeals the judgment of the district court in favor of Southern Union Company, a Delaware corporation, on Southern Union’s claims of tortious interference with a business expectancy and tortious interference with contractual relations, as a result of which Southern Union was ultimately awarded $390,072 in compensatory damages and $60,000,000 in punitive damages. Southern Union cross-appeals the district court’s decision to keep its claim of lost profits from the jury.
*1003 We hold, first, that the appeals were timely filed; second, that the compensatory damage award should be affirmed; and third, that the punitive damages are constitutionally disproportionate to the harm found.
Jurisdiction. The case was brought by Southern Union under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, and as a suit asserting diversity jurisdiction under 28 U.S.C. § 1332. In the course of the proceedings, various defendants settled with Southern Union; the RICO claim dropped out; and only the business and contract torts went to the jury. In this court, our first question is the timeliness of Irvin’s appeal; the timeliness of Southern Union’s cross-appeal is dependent on our finding Irvin’s appeal timely. We state the facts relevant to this issue.
On December 18, 2002, the jury returned its verdict in favor of Southern Union. The jury awarded damages of $975,181 on the contract claim, with 40% liability assigned to Irvin. The jury awarded $975,181 on the business relationship claim with 20% liability assigned to Irvin. The jury awarded $60 million in punitive damages. On January 9, 2003, Irvin moved for judgment notwithstanding the verdict (JNOV) or in the alternative for a new trial or remittitur. On January 24, 2003, the district court issued a ruling as to the proposed form of judgment, taking into account that the jury had assigned different percentages of responsibility to Irvin for the two torts for which the jury held him responsible. The court ruled that the two percentages should be averaged to determine Irvin’s liability. On June 2, 2003, the district court denied Irvin’s motion for JNOV. On July 28, 2003, the district court again denied Irvin’s motion for JNOV and also his motion for a new trial or remittitur. This order, in its entirety, read:
Pending before Court is Defendant Irvin’s Amended Motion for JNOV or in the Alternative for New Trial or Remit-titur. The Court has reviewed the briefing, and will deny the motion. A written opinion will follow early next week.
Accordingly,
IT IS ORDERED that Defendant Irvin’s Amended Motion for JNOV or in the Alternative for New Trial or Remit-titur is DENIED.
DATED this 25 day of July, 2003.
This order was communicated to counsel and docketed on July 28, 2003.
On July 31, 2003, the district court signed a second Order which dealt with Irvin’s two post-trial motions, analyzed them in detail, and denied them. This order was docketed August 1, 2003.
On August 14, 2003, the district court signed what it termed “Final Judgment.” It read, in its entirety, as follows:
These consolidated actions came on for jury trial on October 29, 2002, the Honorable Roslyn O. Silver presiding. On December 18, 2002, all remaining matters having been duly tried and submitted to the jury, the jury rendered its verdict in matter CIV-99-1294-PHX-ROS. Judgment is hereby entered in favor of Southern Union Company and against Defendant James M. Irvin as follows: (1) On Southern Union’s claim for intentional interference with contract, the sum of $975,181.46, adjusted by relative degrees of fault to $390,072.58; (2) On Southern Union’s claim for intentional interference with business expectancy, the sum of $975,181.46, adjusted by relative degrees of fault to $195,036.29; (3) The higher amount of $390,072.58 constitutes the total actual damages assessed against De *1004 fendant Irvin, and in favor of Southern Union; (4) Punitive damages in the sum of $60,000,000.00; (5) Its cost of suit as taxed by the Clerk and as approved by the Court.
DATED this 14 day of August, 2003.
This order was docketed August 18, 2003. Irvin’s Notice of Appeal was filed August 29, 2003, within 30 days of the entry of this judgment.
Southern Union argues that Irvin was late; the appeal deadline was August 27, 2003, thirty days from the entry of the judgment of July 28. Southern Union relies on Federal Rules of Appellate Procedure (FRAP) 4(a)(4)(A), which reads as follows:
(4) Effect of a Motion on a Notice of Appeal.
(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:
(v) for a new trial under Rule 59
Read literally, the rule applies. The district court on July 28, 2003 entered its order disposing of Irvin’s motion for a new trial. The appeal period expired August 27, 2003.
We do not believe that the rule was intended to work in this way. On July 28, 2003, final judgment including the damages had not yet been entered. What would Irvin have appealed? In Alice in Wonderland, the rule is “Sentence first— Verdict afterwards.” We could read our rule to mean Appeal first, Judgment after-wards. But we are not in Wonderland. Irvin’s appeal was timely, as was Southern Union’s, which was filed on September 12, 2003.
Having determined that we do have jurisdiction, we turn to the merits of the two appeals.
FACTS
James M. Irvin was elected in January, 1997 to be one of the three commissioners of the Arizona Corporation Commission (the ACC). This body regulates energy companies in Arizona and has the power to approve or disapprove mergers of such companies. Ariz.Rev.Stat. § 38-431; Ariz. Const, art. XV, 4-5. Irvin became chairman in November 1997 and served in this capacity until May 1999. Jack D. Rose was a lawyer and friend of Irvin and had worked on Irvin’s campaign for election to the ACC. In June 1997, Irvin nominated him to be Executive Secretary of the ACC. Rose served in this capacity until December 31, 1998. Irvin and Rose became defendants in this case because of their relationship to the merger deliberations of Southwest Gas Company (SWG).
On December 14, 1998, SWG announced its agreement to merge with ONEOK, Inc., an appropriate acronym for One-Oklahoma, a leading Oklahoma natural gas company. The price offered by ONEOK was $28.50 per share of SWG stock. The parties agreed that a competing offer at a higher price would entitle SWG to consider the higher offer. On February 1, 1999, Southern Union offered SWG $32 per share on terms otherwise the same. The value of this offer was $108,000,000 over ONEOK’s. If accepted, the deal would have created the largest natural gas utility in the United States. Any merger had to be approved by the ACC and by the appropriate regulatory authorities in California, Missouri, and Nevada. On February 21, 1999, the SWG board unanimously determined that Southern Union’s offer was *1005 a “Superior Proposal” as defined in the merger agreement with ONEOK. That determination meant that Southern Union’s financial plan was “viable”; that “the deal was doable”; and that Southern Union could get regulatory approval. SWG was therefore free to negotiate with Southern Union. Irvin and Rose, however, worked to defeat Southern Union’s proposal.
On December 28, 1998, Rose, still the Executive Secretary of the ACC, sent a business proposal to Prudential Securities, Inc. (PSI), a New York investment house and wholly owned subsidiary of the Prudential Insurance Company of America. Rose wrote: “Last week Southwest Gas Corporation announced that it is being bought out in an all cash transaction. Given my relationship with this company and my ability to advise them on important regulatory issues related to the merger, I believe that I am well positioned to get some of the underwriting business.” Neither Rose as a regulator nor PSI as an underwriter seemed aware of the implications of a regulator touting his ability to obtain business from a company within his jurisdiction.
On December 31,1998, Rose resigned as Executive Secretary. On January 2, 1999, he was hired at the ACC by Irvin as a “Loaned Executive,” without the knowledge or approval of other ACC commissioners.
On February 12, 1999, Irvin called Larry Brummett, chairman of ONEOK, and told him that he didn’t want a bidding war between ONEOK and Southern Union and that he wanted to write SWG. A few days later, Rose, with Irvin’s approval, traveled to Oklahoma and met Brummett. Brum-mett agreed that Rose could set up a meeting between representatives of PSI and ONEOK. February 28, 1999, the day after Southern Union’s offer became public, Rose called PSI and told them that he was advising the chairman of ONEOK on the proposed merger and would arrange for PSI people to meet the CEO and CFO of ONEOK. On March 2, 1999, Rose met with John Gaberino, general counsel of ONEOK. The next day, Gaberino and Rose met with Irvin, who told Gaberino that Rose had given him a good report on ONEOK and that Irvin intended to contact the other two relevant regulatory bodies, the California Public Utilities Commission (the CPUC) and the Public Utilities Commission of Nevada (the PUCN). Two days later, March 5, 1999, Gaberino and another lawyer for ONEOK worked on a letter for Irvin to send to the board of SWG. Gaberi-no went over the text of this letter with Rose. This letter (the Rose-Irvin letter) was to become an instrument in Irvin’s interference with the proposed Southern Union merger.
On March 9, 1999, J. David Dubin of PSI sent an email to Joseph Sebastian Fichera, a managing director of the same company. This communication was titled “Referral Business Opportunity Through Jack Rose.” Referring to Rose, Dubin stated:
3. Jack says that the Company’s CEO has a strong motive for wanting to reward him presumably for his work in helping the Company obtain favorable regulatory action from the ACC during his tenure as its chief executive. He would like to pursue the Transaction on behalf of PSI and is confident that he can persuade the Company to name PSI as a managing underwriter.
4. Jack is concerned, however, about using up his goodwill with the CEO to obtain an engagement in which the fee income to IBG [= Investment Banking Group or underwriter] will be modest in comparison to the fees IBG would collect (and that he in turn would share) as an *1006 advisor on an acquisition. Hence, Jack has proposed that he and PSI enter into a finder’s fee arrangement under which his contingent payout would be larger if he can deliver a more lucrative appointment for PSI. Specifically, he would propose the following percentage payouts of the fee income booked by IBG on the Transactions:
A. For appointment as a Co-Manager 15% of IBG fee income
B. For appointment as a Senior Manager 33% of IBG fee income
C. For appointment as Sole Manager 40% of IBG fee income.
6. Time is of the essence. Jack’s telephone in Phoenix is 602-906-9007.
On March 10, 1999, Fichera passed this information on to another executive at PSI:
A person we met on the Administrative Securitization trail in Arizona says he can help deliver a significant piece of business to us. The client, he told us today, is Oneok, a major midwestern gas company (Carol Coale does not cover them though she tracks them). We do not have a relationship with this firm (last WARP call date 5/95 from someone no longer here). It is an A rated company and someone we would like to do business with. He is willing to work completely on the comeno deliver, no pay. But, if he does deliver, he wants to be paid big time (see below).
I think this is worth pursuingit is real but need your guidance as to how much to compensate if he really can deliver a senior managed or sole managed deal.
We need to get back to him on Thursday AM.
On March 19, 1999, Fichera, on behalf of Prudential Securities, and Rose entered into a contract providing as follows:
Dear Jack:
This letter is to confirm our mutual understanding with respect to compensation that may be payable to you from Prudential Securities Incorporated (“PSI”) with respect to certain public offerings of securities underwritten by PSI.
You agree to introduce PSI to ONEOK, Inc. and U.S. West (each a “Company”) and to assist PSI in securing the engagement of PSI by each Company (collectively, the “Introduction”). If during the next 24 months either Company consummates a public offering of its securities in which PSI acts as a managing underwriter (a “PSI Underwritten Offering”), PSI will pay to you a fee (the “Fee”) based on a percentage of the management fee paid to PSI with respect to such PSI Underwritten Offering according to the following schedule:

Capacity of PSI Percentage of Management Fee

Co-Manager 15%
Lead Manager or Co-Lead Manager 30%
Sole Manager 35%
The Fee shall be paid to you within 30 days of the receipt of the management fee by PSI, provided that such Fee is not prohibited by law. PSI will only be obligated to pay you a Fee hereunder when the entire fee payable to PSI with respect to a PSI Underwritten Offering has been received by PSI free of adverse claim.
PSI shall reimburse you periodically for your reasonable, out-of-pocket travel and lodging expenses incurred with PSI’s prior consent in connection with the Introduction.
Although only the proposed merger of ONEOK and U.S. West was referred to, this agreement, it could be inferred, was also to govern an ONEOK merger with SWG. A series of telephone calls between *1007 Rose and Irvin punctuated Rose’s negotiations with PSI.
Rose and Irvin were at work even before Rose’s contract was signed. In a memo dated March 16, Mark Dioguardi, a lawyer for ONEOK, had noted: “Letter from one or more Chair would sink [Southern Union].” On that date, Irvin and Rose were in San Francisco. Their trip was unknown to the ACC, and their expenses were not charged to it. In San Francisco they met with members and staff of the CPUC. According to Harvey Morris, who attended the meeting as counsel for the CPUC, Irvin and Rose together conducted a lobbying campaign for ONEOK. They presented the Rose-Irvin letter criticizing a SWG-Southern Union merger, stated that Southern Union would have to issue junk bonds to finance the merger, and added that Southern. Union’s debt-equity ratio would become 80-20. The meeting began and ended with Irvin and Rose urging the CPUC to send the Rose-Irvin letter to SWG. Everything said about Southern Union by the two Arizonans was negative.
On March 23, 1999, Irvin and Rose traveled to Reno, Nevada and the following day met with Judy Sheldrew, the chair of the PUCN. Irvin introduced Rose to talk about the SWG merger proposals. Rose told her that ONEOK was by far the superior candidate. Irvin urged her to have the Nevada commission issue the Rose-Irvin letter to SWG that he had urged upon the CPUC.
On March 25, 1999, Irvin and Rose met with Kenneth Guinn, the governor of Nevada and a former chairman of SWG. They urged him, too, to send a negative letter to SWG regarding Southern Union’s offer. Governor Guinn declined to do so but, instead, called the CEO of SWG and advised him to “read between the lines” of the letter he would receive from Irvin. The Rose-Irvin letter was faxed to SWG by Irvin on April 5, 1999 from his office at the ACC: It was signed by him alone.
April 5 was the same day the SWG board was to meet to discuss the competing merger offers. After faxing his letter, Irvin moved to Rose’s home and from there called the CEO of SWG. Irvin told him that. it was. highly unlikely that a SWG-Southern Union merger would be approved by the ACC and that the California commission was equally concerned about that proposal. This telephone call was tape-recorded and played to the board of SWG. Copies of the Rose-Irvin letter were distributed to the board. Members of the board saw the regulators’ position as a big problem in the way of accepting Southern Union’s, higher offer.
On April 12, 1999, Fichera of PSI and Rose met with officials of ONEOK, who indicated their readiness to do business with PSI. Thereafter Rose sent PSI an amendment to their agreement of March 19, 1999. Whereas the split of “any customary M & A advisory fee” on the ONEOK-U.S. West merger gave only 35% to Rose, the amendment proposed the split of the advisory fee on an ONEOK-SWG merger in this way: “2/3rds to Rose and l/3rd to Prudential up to $3 million and 80% to Rose and 20% to Prudential for any fees in excess of $3 million.” Rose’s proposal was formally accepted by PSI in a contract signed by Fichera and dated June 22,1999.
On April 26, 1999, SWG announced that it had: rejected Southern Union’s offer. The press release of SWG announced that its board “believes that Southern Union would have a more protracted and difficult time in obtaining regulatory approvals, extending eighteen months or longer.” SWG went ahead with ONEOK.
*1008 Rose guided ONEOK through the regulatory process and was congratulated by ONEOK for his help. ONEOK prepared a $300 million debt offering to finance the merger with SWG. PSI was to be a'manager of the underwriting. Rose, however, did not collect his commission. Shortly after Southern Union filed its complaint in this case in July 1999, ONEOK canceled the offering. After Southern Union had conducted discovery in this case and in the course of it gained knowledge of PSI’s agreement with Rose, on the fees he would earn, ONEOK withdrew entirely from the merger.
PROCEEDINGS
On July 19, 1999, Southern Union filed its complaint in this ease. Its second amended complaint, filed July 25, 2000, was the operative basis of the trial. Before trial, on December 15, 2000, the district court dismissed the RICO claims on the ground that they constituted a securities fraud claim and were therefore barred by the Private Securities Litigation Reform Act of 1995, 18 U.S.C. § 1964(c).
In 2001, the multiple defendants moved for summary judgment. On January 4, 2002, the district, court entered a comprehensive order disposing of these motions. We note the relevant rulings. (1) Granted was a motion to deny Southern Union the right to present a jury with evidence of its lost profits. (2) Denied was a motion for summary judgment by Jack Rose. The court observed that Rose had invoked his privilege against self-incrimination as to the matters at issue and that his invocation of the privilege in a civil suit left the fact-finders free to draw adverse inferences against him. (3) Denied was a motion for summary judgment by ONEOK, the court ruling .that. “ONEOK’s characterization of the evidentiary record is demonstrably false.” After discovery and various. motions, on October 29, 2002, a jury of nine was selected, sworn, and empaneled.
Prior to trial, an incident occurred that made a sharp impression on the district court and is best presented in the judge’s own words as she reviewed Irvin’s post-trial motion for remittitur: Irvin participated in a “scheme to impede the jury’s search for truth at trial.” The scheme involved his wife, Carol, fabricating notes of a telephone call of July 31, 1999, between herself and Jack Rose; in the conversation Rose appeared to exculpate Irvin from any charge of wrongdoing. Irvin gave the notes to his counsel, who presented them to the court. When counsel for Southern Union obtained the opportunity for its forensic examiner to inspect the notes, Irvin’s counsel admitted that the notes were not contemporaneous with the telephone call but had just recently been written; he withdrew his proffer of the notes. Southern Union then moved to admit the notes as evidence of Irvin’s intentional fabrication of evidence. The court granted the motion.
After nearly two months of trial, the jury returned its verdict. The subsequent proceedings and the appeals have already been noted.
ANALYSIS
Evidence supporting the verdict. Irvin continues to argue that he is entitled to JNOV because Southern Union failed to show that his efforts caused SWG to reject its offer. He cites the testimony of a pair of SWG officers who had doubts' about Southern Union’s offer, but each of these witnesses tied their doubts to difficulties the regulators might raise. Some members. of SWG’s board did not think Irvin’s interventions significant. Others did. That adverse inferences could be drawn against Rose has already been observed. Some of the strongest evidence from which *1009 the jury could draw inferences was the value ONEOK placed on Rose’s services and relationship with Irvin as well as Rose’s own high evaluation of his help after the April 5, 1999, meeting of- the SWG board. Enough evidence was presented to the jury for it to find that Irvin caused at least 40% of the harm to Southern Union by interfering with its contractual relations; his interference was a significant cause. Caudle v. Bristow Optical Co., 224 F.3d 1014, 1023-24 (9th Cir.2000) (as amended) (citing Wagenseller v. Scottsdale Mem’l Hosp., 147 Ariz. 370, 710 P.2d 1025, 1041 (1985)).
Irvin’s scope of authority defense. Under Arizona law, a statute regulates claims against public employees such as Irvin. Ariz.Rev.Stat. § 12-821.01(A). It applies if the suit is against the employee in his public capacity and is directed to cases making claims against the employee’s public employer. Id.
Irvin has found a decision of an intermediate Arizona court that he contends fits his case:
[I]t is unnecessary for the claimant to sue the employer or file a notice of claim against either the individual public employee or the employer. Instead, in such a ease the issue of whether the defendant was acting within the course and scope of his employment remains to be decided by the trier of fact, and a plaintiff who fails to file a notice of claim does so at his own- risk. The parties have not reached the point in the proceeding at which it is appropriate to raise and decide the question whether the acts were done in the scope of Crum’s employment, but it is clear that it cannot be resolved on a motion to dismiss. In any event, if the plaintiff does not file a notice, and the finder of fact concludes that the defendant was acting within the course and scope of his employment, the plaintiff cannot have judgment against the defendant.
Crum v. Super. Ct., 186 Ariz. 351, 922 P.2d 316, 318 (Ct.App.1996).
A majority of this court holds that, under the rule stated in Crum, Irvin was entitled to have the jury consider his defense that his actions were within the scope of his duties as a member of the ACC. Despite this holding, a different majority concludes that the instructional error was harmless. Assessing punitive damages of $60 million against him, the jury provided “a strong indication” that it disbelieved Irvin’s account of what he was up to. Larez v. Holcomb, 16 F.3d 1513, 1518 (9th Cir.1994). Southern Union’s view of the facts, accepted by the jury, was that Irvin’s acts were connected with his official duties only as much as a judge accepting a bribe to decide a case in favor of the briber would be engaging in conduct connected to his duty as a judge. Large punitives are “evidence that an erroneous jury instruction was harmless.” See Swinton v. Potomac Corp., 270 F.3d 794, 806 (9th Cir.2001), cert. denied, 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002). In short, the award here “makes it quite plain” that the jury would have come to the same conclusion even if the Crum instruction had been given. Lambert v. Ackerley, 180 F.3d 997, 1009-10(9th Cir.1999) (en banc), cert. denied, 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000).
The punitive damages. Sixty million dollars in punitives after an award of compensatory damages against Irvin of $390,072! The ratio of over 153 to 1 immediately commands our attention. It cannot survive the constitutional scrutiny required by the Supreme Court. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).
*1010 No bright line has been set beyond which punitives may not go. Id. at 425, 123 S.Ct. 1513. But we have been reminded that, under established principles, few awards exceeding a single digit ratio to a significant degree “will satisfy due process.” Id. Even an award more than four times the amount of compensatory damages “might be close to the line of constitutional impropriety.” Id. History points to double, triple, or quadruple punitives; these ratios “are instructive.” Id. In the light of these admonitions and suggested boundaries, we review the jury award and the judge’s ruling sustaining it.
“ ‘The most important indicium of the reasonableness of a punitive, damages award is the degree of reprehensibility of the defendant’s conduct.’ ” Id. at 419, 123 S.Ct. 1513(quoting BMW of North America, Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). Briefed on. Campbell, the district court properly looked first at this factor. The court found Irvin’s conduct to be “marked by two factors: repeated actions and harm caused by intentional trickery and deceit.” Irvin, the court stated, had abused his powers as a commissioner “in favor of the private interests of a specific utility company, ONEOK, and his personal interests .... ” Harm to Southern Union was inflicted by Irvin by his letter and his telephone call to the April 5, 1999 board meeting of SWG and by his instigation of Governor Guinn’s call. This actual harm was the culmination of two months of planning and activity directed to blocking the proposed Southern Union merger.
Irvin’s purposeful persistence in this effort, the district court found, was matched by his efforts at concealment. As far as possible, his activities to block the merger were kept from his fellow commissioners, and, the court added, “afterwards he covered up his wrongdoing to ensure the outcome of the scheme.”
When Southern Union challenged him and began litigation, Irvin’s effort at concealment continued: “he persevered in hiding his wrongful acts throughout the trial and in particular while testifying in Court before the jury.” The court marked as “particularly egregious” Irvin’s manufacture of evidence — the fabricated notes of his wife’s telephone conversation with Rose, which Irvin persuaded his counsel (paid for him by the state of Arizona) to present as genuine to the court. The court found this “intentional fabrication of evidence” by Irvin to show his consciousness of guilt and to go to the reprehensibility of his conduct.
The district court noted that neither Campbell nor Gore considered reprehensible conduct by a public official. The court noted that significant consideration must be given to the nature of the public trust embodied in the public office the official held. The court noted the broad power, of the ACC, which the Supreme Court of Arizona said was “treated as a fourth branch of.government in Arizona.” Polaris Int’l Metals Corp. v. ACC, 133 Ariz. 500, 652 P.2d 1023, 1029 (1982).
The court turned to the award of puni-tives in civil rights cases under 42 U.S.C. §§ 1981 and 1983 where the ratio of puni-tives to actual damages far exceeded a single digit ratio.
Indeed nominal damages had been held sufficient to support the award of punitives against a public officer. Gill v. Manuel, 488 F.2d 799, 802 (9th Cir.1973). In holding that municipalities are exempt from punitives in civil rights cases, the Supreme Court noted that effective deterrence was achieved by the assessment of punitives against the offending official. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 269-70, 101 S.Ct. 2748, 69 L.Ed.2d 616 *1011 (1981). The district court held that the single digit ratio was not the right measure from harm by a public official abusing his trust.
The district court was right in seeing reprehensible conduct by a public official as presenting an issue not addressed by Gore and Campbell. It was, however, we believe, mistaken in using awards in civil rights causes as a bench mark. The redress of racial, religious or gender discrimination has been treated as a special area of public concern where affront to human rights may require high punitives. Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1043 (9th Cir.2003), cert. denied, 541 U.S. 902, 124 S.Ct. 1602, 158 L.Ed.2d 244 (2004). We do not believe that the civil rights case ratios apply to a case brought as a private tort action.
We do not mean to minimize the magnitude of Irvin’s exploitation of his office. The jury was entitled to consider how he worked hand in glove with Rose and what this cooperation meant in securing for Rose 66-2/3% of the underwriting management fee up to $3 million and 80% of the fee beyond $3 million. That no payoff could be shown was because the grateful underwriter withdrew as this litigation went on. Nothing in Irvin’s extraordinary efforts suggests that he was motivated only by a selfless desire to enrich Rose.
The failed plan to introduce fabricated evidence also did not bring a profit to Irvin, nor, since it failed, did it do any economic harm. Nonetheless, this shady strategy could appropriately enter the jury’s calculation. See United States v. Perkins, 937 F.2d 1397, 1401-2 (9th Cir.1991). In addition, Irvin was observed at his ACC office destroying documents subpoenaed by the plaintiff, and his secretary had her hard drive reformatted. In court, Irvin repeatedly denied evidence of his misconduct, to the extent that the district court found his testimony to be part of his reprehensible conduct. As his document destruction was incomplete and as his words under oath did not convince the jury, no economic harm was done by them. They were grave injuries to the judicial process.
To sum up our view of the punitives, the ratio to actual damages is too high. The noneconomic damage to the judicial process and the exploitation of high public office were properly taken into account. We vacate the award, remanding for the district court to offer the option of a remit-titur or a new trial on the punitives. . We leave to the discretion of the district court the ratio to be set if it orders remittitur.
Southern Union’s appeal. The district court found that Southern Union offered “insufficient evidence to establish the terms of a consummated merger with Southwest.” Although Southern Union points to evidence to the contrary, we are unwilling to reverse the well-informed trial judge on this close question, especially as a new trial on the alleged lost profits would, at most, lead to the award of damages not likely to be collected.
Conclusion. The award of punitive damages is vacated and this issue is remanded to the district court with instruction to order a remittitur or a new trial on this issue. The judgment against Irvin for compensatory damages is affirmed. Southern Union’s cross-appeal is denied.
03-16649 — Affirmed in part, vacated in part, and remanded.
03-16729 — Affirmed.